J-A16019-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF L.M.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: G.L. AND A.L. | : : : : : : : : | |
| | : | No. 276 MDA 2023 |

Appeal from the Order Entered January 20, 2023
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  49-ADOPT-2022

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: SEPTEMBER 21, 2023**

G.L. and A.L. ("Appellants") are the maternal grandparents of L.M.M. ("Child") (born in December of 2019).  Appellants appeal from the orphans' court's January 20, 2023 order denying their "Petition for Involuntary Termination of Parental Rights of Natural Father."[1]  After careful consideration, we affirm.

The orphans' court sets forth a detailed recitation of the facts of this case in its Pa.R.A.P. 1925(a) opinion filed on March 23, 2023.  **See** Orphans' Court Opinion (OCO), 3/23/23, at 3-7.  Briefly, Child was born when Father and Mother were both seventeen years old.  **See** OCO at 3.  Child, along with Father and Mother, lived with Appellants immediately after Child's birth.

_____

[1] At the time the January 20, 2023 order was entered, Mother had indicated a desire to voluntarily terminate her parental rights to L.M.M.; however, no final order had been entered by the court regarding Mother's parental rights. Mother is not a party to this appeal.

Eventually, Mother and Father both moved out of Appellants' home, but Child remained living with them. In 2020, Appellants filed a custody action against Father, resulting in a custody agreement whereby Appellants have primary custody of Child and Father has visitation rights. Over the ensuing years, Father maintained a relationship with Child and visited Child in accordance with the custody agreement, albeit at times sporadically. In May of 2022, Father filed for modification of the custody agreement. Three weeks later, Appellants filed the petition to terminate his parental rights.

The orphans' court appointed a guardian *ad litem* and an attorney for Child, as well as counsel for Father. On October 3, 2022, and November 7, 2022, the court held a bifurcated hearing on Appellants' petition to terminate Father's parental rights. On January 19, 2023, the court issued an order denying that petition. Appellants filed a timely notice of appeal, accompanied by a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The court filed a responsive opinion on March 23, 2023.

Herein, Appellants state five issues for our review:

1. Whether the [orphans' c]ourt erred and/or abused its discretion in that its determinations were manifestly unreasonable as to both Sections 23 Pa.C.S. [§§] 2511(a)(1) and 2511(a)(2) when the testimonial record is viewed in its entirety.

2. Whether the [orphans' c]ourt erred and abused its discretion by placing manifestly unreasonable "significant" weight upon Father's filing a custody modification petition just before the filing of the petition for termination, where Father failed to seek any significant change in the limited visitation arrangement and still intended for … [C]hild to stay in the primary custody of

- 2 -

Grandparent Appellants and for [Appellants] to continue to provide virtually all childcare for … Child.

3. Whether the [orphans' c]ourt erred and abused its discretion through manifest unreasonableness, where the [orphans' c]ourt virtually excused Father from performing parental duties arising from Father's choice to merely see … Child for several hours at a time and only sporadically.

4. Whether the [orphans' c]ourt erred and abused its discretion through manifest unreasonableness, where the [orphans' c]ourt indicated/suggested that termination is not necessary where Father will be allowed to continue to see … Child after adoption, thus potentially endangering the ability to terminate parental rights pursuant to the PA Adoption Act where an Act 101 Agreement is offered by Adoptive Parents.

5. Whether the [orphans' c]ourt erred and abused its discretion through manifest unreasonableness where the [orphans' c]ourt completely ignored and failed to properly consider the developmental, physical and emotional needs of the child, as required by 23 Pa.C.S. [§] 2511(b).

Appellants' Brief at 4-5 (some formatting altered).

Initially, we note that Appellants' second and fourth issues are waived based on their failure to present those claims in their Rule 1925 statement. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."). Regarding Appellants' remaining claims, we note that our review is guided by the following principles:

In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the

- 3 -

record in order to determine whether the trial court's decision is supported by competent evidence.

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. We may uphold a termination decision if any proper basis exists for the result reached. If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result.

*In re Z.P.*, 994 A.2d 1108, 1115–16 (Pa. Super. 2010) (cleaned up).

Here, in assessing Appellants' arguments, we have reviewed their brief, Father's brief, the certified record, and the applicable law. We have also considered the thorough opinion of the Honorable Christylee L. Peck of the Court of Common Pleas of Cumberland County. We conclude that Judge Peck's thoughtful analysis sufficiently addresses the issues Appellants raise herein. Moreover, our review of the record reveals evidentiary support for Judge Peck's decision to deny Appellants' petition to terminate Father's parental rights. Appellants have failed to demonstrate an abuse of discretion or error of law in that ruling. Accordingly, we adopt Judge Peck's decision as our own, and affirm the order denying Appellants' petition to terminate Father's parental rights for the reasons set forth therein.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/21/2023

IN RE: ADOPTION OF : IN THE COURT OF COMMON PLEAS OF
L.M.M., a Minor : CUMBERLAND COUNTY, PENNSYLVANIA
:
:
Appeal of G.L. and A.L. : 49 ADOPTIONS 2022

## OPINION PURSUANT TO PA.R.A.P. 1925

Peck, J., March 22, 2023 –

Appellants, maternal grandparents of the Child (hereinafter "Maternal Grandparents," "Maternal Grandmother," or "Maternal Grandfather"), filed a petition to involuntarily terminate Father's parental rights to the Child on June 9, 2022 and a petition to confirm Mother's consent to termination of her parental rights on July 18, 2022.[1] We appointed a guardian ad litem and an attorney for the Child,[2] as well as counsel for Father upon his request for court-appointed counsel.[3] We held a hearing over two days, on October 3, 2022 and November 7, 2022.[4] We

---

[1] Petition for Involuntary Termination of Parental Rights of Natural Father, filed June 9, 2022; Petition to Confirm Consent to Termination of Parental Rights of Natural Mother, filed July 18, 2022 (not the subject of this appeal). At the outset of the first termination hearing, Mother consented to the termination of her parental rights but we issued no order with respect to that petition until we could rule on the petition as to Father. When we ultimately denied Maternal Grandparents' petition to terminate Father's rights, we ordered Mother's counsel to consult with Mother as to whether she still wished to have her rights voluntarily terminated. Order of Court, In re: Petition for Involuntary Termination of Parental Rights of Natural Father, January 19, 2023 (Peck, J.). While the responsive filing indicated Mother no longer wishes to have her rights voluntarily terminated, and Maternal Grandparents were in agreement with withdrawing that petition, we held the Petition to Confirm Consent to Termination of Parental Rights of Natural Mother in abeyance pending this appeal. Position of Natural Mother, [A.L.], Relative to Her Parental Rights Per Directive Set Forth in Order of Court Issued on January 19, 2023, filed February 13, 2023; Petitioner's Reply to Natural Mother's Position, filed March 14, 2023; Order of Court, In re: Petition to Confirm Consent to Termination of Parental Rights of Natural Mother, March 15, 2023 (Peck, J.).

[2] Order of Court, In re: Petition for Involuntary Termination of Parental Rights, August 2, 2022 (Peck, J.).

[3] Order of Court, In re: Appointment of Counsel Order to Continue Hearing, September 9, 2022 (Peck, J.).

[4] Order of Court, In re: Petition to Confirm Consent of Mother & Petition for the Involuntary Termination of the Parental Rights of the Father, October 3, 2022 (Peck, J.); In re: Petition for

took the matter under advisement at the close of the November hearing and issued an order denying Maternal Grandparents' petition to terminate Father's parental rights on January 19, 2023.[5] Maternal Grandparents filed a timely Notice of Appeal on February 17, 2023, accompanied by the following Concise Statement of Errors:

1. Whether the trial court committed an abuse of discretion or error of law by denying Petitioners'/Appellants' request that Natural Father's parental rights be involuntarily terminated pursuant to 23.Pa.C.S. 2511(a)(1), where the child's legal counsel and Guardian ad Litem both recommended the termination of Natural Father's parental rights.

. . .

2. Whether the trial court committed an abuse of discretion or error of law by denying Petitioners'/Appellants' request that Natural Father's parental rights be involuntarily terminated pursuant to 23.Pa.C.S. 2511(a)(2), where the child's legal counsel and Guardian ad Litem both recommended the termination of Natural Father's parental rights.

. . .

3. Whether the trial court committed an error of law or abuse of discretion by finding Father's efforts to maintain a relationship with the child legally sufficient, where the trial court described his contact with the child as sporadic, and at times, absent.

. . .

4. Whether the trial court committed an error of law or abuse of discretion by failing to give primary consideration to the developmental, physical, and emotional needs and welfare of the child when denying Petitioners'/Appellants' request that Natural Father's parental rights be involuntarily terminated pursuant to 23.Pa.C.S. 2511(a)(1) and (a)(2).

. . .

5. Whether the trial court committed an error of law or abuse of discretion by failing to find that, pursuant to 23 Pa.C.S. 2511(a)(2), Natural Father's repeated neglect, incapacity, or refusal to parent had caused the child to be without essential parental care, control or subsistence necessary for her physical or mental well-being, where the court urged Father to consistently commit his time, affection, and care to the child with greater urgency.

. . .

6. Whether the trial court committed an error of law or abuse of discretion by failing to find that, pursuant to 23 Pa.C.S. 2511(a)(2), Natural Father's repeated neglect, incapacity, or refusal to parent will not be remedied, where

_____

Involuntary Termination of Parental Rights, February 7, 2022 (Peck, J.); Amending Order of Court, In re: Petition for Involuntary Termination of Parental Rights, November 8, 2022 (Peck, J.).

[5] Order of Court, In re: Petition for Involuntary Termination of Parental Rights of Natural Father, January 19, 2023 (Peck, J.).

2

the child is three (3) years old and has never visited with Father outside of a supervised setting for more than four (4) hours.

. . .

7. Whether the trial court committed an error of law or abuse of discretion by failing to find that, pursuant to 23 Pa.C.S. 2511(a)(1), Natural Father evidenced a settled purpose to relinquish parental claim to the child, where in the six (months) preceding the Appellants' Petition, Natural Father saw the child for no more than eight (8) hours.

. . .

8. Whether the trial court committed an error of law or abuse of discretion by failing to find that Natural Father, pursuant to 23 Pa.C.S. 2511(a)(1), by conduct continuing for at least six months immediately preceding the filing of the petition, failed or refused to perform parental duties, where in the six (months) preceding the Appellants' Petition, Natural Father saw the child for no more than eight (8) hours and went more than four months without any contact, and did not see the child at all during the three months preceding that six (6) month period.[6]

We offer this Opinion in support of our judgment pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

### STATEMENT OF FACTS

The Child, born in 2019, was almost three years old at the time of the hearings, and Mother and Father were both 20 years old. The Child has been living with Maternal Grandparents since birth. Maternal Grandmother testified that when the Child was born, the plan was for Mother to care for the Child in their home and Father would spend weekends there for both parents to have the support of Maternal Grandparents while they parented.[7] After two months, Maternal Grandparents asked Father to move out because they felt he was not contributing to parenting the Child as planned.[8] When the Child was about six months old, Mother explained to Maternal Grandparents that she wished to put the Child up for

---

[6] Petitioner's/Appellants' Statement of Errors Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b), filed February 17, 2023.

[7] Transcript of Proceedings, In re: Petition to Confirm Consent of Mother & Petition for the Involuntary Termination of the Parental Rights of the Father, October 3, 2022, at 8-9 (Peck, J.) (hereinafter, "N.T. 10/3/22 at ___").

[8] N.T. 10/3/22 at 9-10, 12.

3

adoption, but Maternal Grandparents instead began caring for the Child full time and eventually, about a year after the Child's birth, Mother enrolled in college and began living on campus, outside of Maternal Grandparents' home.[9] Between February 2020 when Maternal Grandparents told Father he could not live with them anymore on weekends and September 2020, Father did not visit with the Child.[10] Maternal Grandmother explained, "that was active Covid and [they] were just following the rules," which prompted the paternal grandfather to send what Maternal Grandmother classified as "threatening texts" about Father coming to visit.[11] Father testified that Maternal Grandparents did not permit him to visit for a period of two or three months in 2020 because of Covid-19 restrictions not permitting "anyone [to] leave the house," though he reached out a few times to attempt to see the Child.[12] Maternal Grandparents filed a custody action against Father in September 2020[13] and Maternal Grandmother said that Father began visits three days a week with the Child in that time period, as permitted by the custody order.[14]

Maternal Grandmother said that a month or two after the custody order was issued, apparently some time in late 2021, the visits went from three visits a week to two visits a week based on a change in Father's work schedule.[15] Maternal Grandmother testified that in May 2021, Father texted her to ask if they could

---

[9] N.T. 10/3/22 at 11-14.

[10] N.T. 10/3/22 at 15-16.

[11] N.T. 10/3/22 at 16.

[12] Transcript of Proceedings, In re: Petition for Involuntary Termination of Parental Rights, November 7, 2022, at 6 (Peck, J.) (hereinafter, "N.T. 11/7/22 at ___").

[13] N.T. 10/3/22 at 15. Maternal Grandmother said she filed the custody action for her family's "protection" because Father's family members sent "occasional texts, threatening texts . . . saying that they were going to come and just take [the Child]." N.T. 10/3/22 at 14. While we sympathize greatly with the maternal family's fear that the paternal family might attempt to remove the Child from their home without warning or preparation, we are also cognizant that this appears to have been a tumultuous and contentious time between Father and the maternal family.

[14] N.T. 10/3/22 at 15.

[15] N.T. 10/3/22 at 16.

4

change the custody schedule because his work schedule would not permit him to get to their home at a reasonable time given the bedtimes of the children in their home.[16] Maternal Grandmother agreed, and from May 2021 to May 2022, the visitation agreement was for Father to visit the Child every other Sunday for three hours in the evening.[17] In the meantime, Maternal Grandmother testified, Father missed the majority of his scheduled visits.[18]

Maternal Grandparents secured the admission of Petitioner's Exhibit 1, which indicates visits occurred as follows: three visits in November 2020, six visits in December 2020, three visits in January 2021, three visits in February 2021, two visits in March 2021, no visits in April 2021, one visit in May 2021, no visits in June 2020, two visits in July 2021, one visit in August 2021, one visit in September 2021, no visits in October through November 2021, three visits in December 2021 including Christmas Day, no visits January through April 2022, and two visits in May 2022.[19]

Father filed for a modification of the custody schedule in May 2022,[20] which the calendar exhibit indicates was received by Maternal Grandparents on May 17, 2022,[21] and Maternal Grandparents filed the petition to terminate Father's parental rights three weeks later on June 9, 2022. Father said he filed the petition to modify the custody order because he had changed jobs and was unable to make the custodial times work, and because he would like to be able to take the Child out during visits, away from Maternal Grandparents' home.[22] On this point, we note that Maternal Grandmother testified that on at least one occasion, the paternal

---

[16] N.T. 10/3/22 at 26.
[17] N.T. 10/3/22 at 26-27.
[18] See N.T. 10/3/22 at 21.
[19] Petitioner's Exhibit No. 1, Calendar of Visits.
[20] Father's Exhibit No. 1, Petition to Modify Custody Order (filed May 16, 2022).
[21] Petitioner's Exhibit No. 1, Calendar of Visits.
[22] N.T. 11/7/22 at 9, 16-17.

5

grandmother asked Maternal Grandmother directly if the paternal grandmother and her family could have some time with the Child, which she permitted.[23] On another occasion the paternal grandmother wanted Father to bring the Child to a family birthday party, and Maternal Grandmother responded by sending a message to Father saying that "[w]hat is best for [the Child] now is for you to develop a relationship with her before introducing anyone else," because she was not willing to allow the Child to leave the home "with strangers."[24] Father's Exhibit 9 indicates that following May 2022, his visits picked up as follows: two visits in June 2022, seven visits in July 2022, four visits in August 2022, four visits in September 2022, and five visits in October 2022.[25] Father missed his scheduled visits between the two termination hearings (evidently scheduled for some time between October 21 and November 7, 2022), which the GAL expressed was significant given Father was under the microscope at this time.[26] We found Father's testimony credible, however, that he had RSV and accompanying illness over that time period.[27]

Maternal Grandmother testified to her view that Father does not perform many parental duties when he is visiting with the Child. She and Maternal Grandfather testified that while Father has helped the Child with going to the bathroom a few times and gotten juice for the Child when she has put it out for him, Maternal Grandparents are primarily the ones changing and feeding the Child.[28] Father responded to this testimony by saying that when he arrives for visits, the Child has already had dinner, but they have snacks and play.[29] He also said that in the past,

---

[23] N.T. 10/3/22 at 37-38.
[24] N.T. 10/3/22 at 37-39.
[25] Father's Exhibit No. 9, Visit Log.
[26] N.T. 11/7/22 at 43.
[27] N.T. 11/7/22 at 13.
[28] N.T. 10/3/22 at 49, 56.
[29] N.T. 11/7/22 at 15.

6

he did not change diapers because the Child was not comfortable enough with him, but that he has been changing diapers for the last few months and gets the Child juice and milk when he is with her.[30]

Maternal Grandmother also testified to concerns that Father was previously using drugs; he had previously tested positive through in-home testing at Maternal Grandparents' home for marijuana and cocaine in June of 2022, but both Maternal Grandmother and Father testified he has tested clean since then.[31] Father has been paying child support to Maternal Grandparents through wage attachment since January 2021.[32] Father said he was current through September 2022, but because he had just changed jobs he was in arrears at the time of the hearings while he awaits paychecks from his new job.[33]

## DISCUSSION

This Court begins by addressing the standard of review applicable to Maternal Grandparents' claims. Pennsylvania appellate courts "adhere[] to the view that the trial court is in the best position to determine credibility, evaluate the evidence, and make a proper ruling." In re R.I.S., 36 A.3d 567, 572 (Pa. 2011). Absent an abuse of discretion or error of law, where the trial court's findings are supported by competent evidence, an appellate court must affirm the trial court even though the record could support the opposite result. In the Interest of R.J.T., 9 A.3d 1179, 1190 (Pa. 2010). Pennsylvania courts have held that "an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. . . . Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-

---

[30] N.T. 11/7/22 at 15-16.
[31] N.T. 10/3/22 at 29, 43; N.T. 11/7/22 at 11-12. Maternal Grandmother testified that their custody order allows Maternal Grandparents to drug-test Father at will. N.T. 10/3/22 at 49-50.
[32] N.T. 11/7/22 at 14; N.T. 10/3/22 at 35.
[33] N.T. 11/7/22 at 14.

will." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012) (internal citations omitted).

When evaluating a petition for termination of parental rights, a court must conduct a two-part analysis. First, a court must determine if the petitioner has proven that at least one of the statutory grounds of termination set out in 23 Pa.C.S. § 2511(a) has been met. See In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004). The focus of this prong is on the conduct of the parent. In re: L.M., 923 A.2d 505, 511 (Pa. Super. 2007). Second, the court must evaluate whether the termination is in the best interest of the child, as required by 23 Pa.C.S. § 2511(b). Id. The burden is on the petitioner to prove by clear and convincing evidence[34] that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). Maternal Grandparents claim we erred as to both analyses, and raise various points of argument as to each, spread over eight errors raised on appeal. We address all claims herein within our overall analysis as to whether Maternal Grandparents proved a sufficient statutory ground and whether termination was in the Child's best interests, pursuant to Sections 2511(a) and (b), respectively.[35]

*1. Sufficiency of Evidence of a Statutory Ground Pursuant to Section 2511(a)*

Maternal Grandparents alleged two grounds for termination under Section 2511(a):

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled

---

[34] "Before terminating a parent's rights, the trial court must receive testimony 'that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" In re Adoption of A.C., 162 A.3d 1132-33 (Pa. Super. 2017) (quoting In re Adoption of Atencio, 650 A.2d 1064, 1066 (Pa. 1994)).

[35] Seven of Appellants' Concise Statement Errors relate to Section 2511(a), and one relates to Section 2511(b). To prevent repetition of our analysis, we address all seven errors together in our analysis of Section 2511(a).

8

purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(1)-(2).[36] We begin with Subsection (a)(1). We note, first, that "any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition" pursuant to Subsection (a)(1) shall not be considered by the court, and our focus is therefore on the six months preceding the filing of the petition to terminate Father's rights. However,

the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

In re K.Z.S., 946 A.2d 753, 758 (Pa. Super. 2008) (quoting In re B., N.M., 856 A.2d 847, 855 (Pa. Super. 2004)). In consideration of the totality of the circumstances, and assuming the statutory criteria of Subsection (a)(1) are satisfied, a court must then evaluate:

(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b).

In re Adoption of L.A.K., 265 A.3d 580, 593 (Pa. 2021). The courts have described "parental duty" as being

best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, [the courts have]

---

[36] See Petition for Involuntary Termination of Parental Rights of Natural Father, ¶¶ 12-13, filed June 9, 2022.

9

held that the parental obligation is a positive duty which requires affirmative performance.

K.Z.S., 946 A.2d at 759 (quoting B., N.M., 856 A.2d at 855).

We carefully considered Father's conduct over the six months preceding the filing of the termination petition in June of 2022 and all attendant circumstances. Father visited the Child five times in the six months preceding the filing of the termination petition, with three visits occurring in December 2021 and two in May 2022.[37] As we alluded to in our order denying Maternal Grandparents' petition to terminate, this statistic was less than impressive and we urged Father to exhibit greater urgency in his care of the Child. In their Concise Statement of Errors, Maternal Grandparents point to that Order and the language we used therein as conclusive that we should have terminated Father's parental rights. However, our analysis was not so black and white, as we also noted in our Order denying the petition. We gave great weight to the fact that Father filed for a modification of the custody order just prior to the Maternal Grandparents' filing of the termination petition. We credited Father's testimony that he filed to modify the custody schedule because he was having difficulty making his custodial times work with his work schedule and because he hoped to be able to spend some custodial time with the Child outside of the Maternal Grandparents' home.

On this point, we note that some consideration must be paid to the fact that Maternal Grandparents would not allow Father to take the Child from their home, particularly to the extent that Father's ability to perform parental duties totally independently is limited by the fact that he was limited to appearing at their home and parenting under their eye, pursuant to the custody order and to the wishes of

---

[37] The dates of the visits were December 6, December 10, and December 25. Petitioners' Exhibit No. 1, Calendar of Visits.

10

Maternal Grandparents.[38] We sympathize with Maternal Grandparents' position that they did not feel comfortable with Father allowing the Child access to paternal family who were strangers to her, but this issue is partly the consequence of Maternal Grandparents' position that the paternal family cannot be a support for the Child until they are satisfied with Father's participation. We are also not poised to speculate how precisely Father may remove the Child from their home in a way best suited to the welfare of the Child; such a judgment is best made by the judge presiding over the custody matter, which is partly why Father's filing of the petition to modify custody is significant. Father cannot be said to have evidenced a settled purpose of voluntarily relinquishing his claim to the Child when he filed to modify the custody order to allow for better access to the Child, and we find support in the case law that this, too, is the exercise of parental duty that prevents a finding that Father failed or refused to perform parental duties or relinquished his claim to the Child, and we substantially credit Father for same. See L.A.K., 265 A.3d at 595 (finding that where the father waited for one year of sobriety before establishing a relationship with his children via filing to modify the custody order, such "legal action constituted the affirmative performance by Father of a positive parental duty in the crucial six-month period before Appellees filed the termination petitions.")[39]

---

[38] N.T. 11/7/22 at 16; N.T. 10/3/22 at 31, 54. Father's counsel argued at the close of the hearing, "[f]or a 17-year-old, 18-year-old, 19-year-old, he has had a lot of visits having to commute from Lebanon under what would definitely be awkward circumstances visiting with being confined to the maternal grandparent[s'] house." N.T. 11/7/22 at 52. We agree that the visitation situation is likely a somewhat awkward one.

[39] In our analysis of what weight to give the fact that Father filed a petition to modify the custody order just prior to Maternal Grandparents filing the petition to terminate, we were guided by In re Adoption of C.M., 255 A.3d 343 (Pa. 2021), and In re Adoption of L.A.K., 265 A.3d 580 (Pa. 2021). In C.M., the mother refused to permit Father to have contact with the children, the father initiated legal proceedings to enforce his custodial rights, two months later the termination petition was filed, and subsequently the father attended the court-ordered mediation and conciliation. The Supreme Court ruled that his "proactive participation in the custody court's

11

We also took into consideration the three-part evaluation even assuming Father had failed to perform parent duties. With regard to the effect of termination on the Child, we do not agree with Maternal Grandparents' position that termination would give the Child the stability and clarity often accompanying termination. It does not appear that much would change, practically speaking, for the Child, given that Father would continue to have visits with the Child (which we credit Maternal Grandparents for allowing in the best interest of the Child), that the

measured requirements . . . demonstrates affirmative performance of Father's parental duties" in the two months prior to the filing of the termination petition sufficient to defeat a finding that Subsection (a)(1) was proven. C.M., 255 A.3d at 368. In L.A.K., the father filed to modify the custody order only after he had achieved a year of sobriety in the midst of a prolonged absence from the children's lives. The Supreme Court held that the filing of the custody action defeated the claim that the father failed or refused to perform parental duties or demonstrated a settled purpose of relinquishment during the six-month look-back period. L.A.K., 265 A.3d at 595. The court held:

> Moreover, consistent with the . . . three-part analysis this Court blessed in C.M. to evaluate the totality of the circumstances, the trial court considered Father's explanation for his prolonged absence from the children's lives (his alcoholism and struggle to obtain sobriety), his attempts at post-abandonment contact (filing a petition to modify the custody order), and the effect that termination would have on the children's physical and emotional needs[.]

Id. The Supreme Court made the additional note:

> In C.M., the Court also credited the father with following up on his filing of the custody petition by attending and participating in the mediation and reconciliation proceedings in the two months immediately prior to the filing of the termination petition. But for the swift filing of the termination petition after the commencement of the custody proceeding by Father, this case would be on all fours with C.M. in terms of the custody matter.

L.A.K., 265 A.3d at 594 n.8 (internal citations omitted); see also In re Adoption of W.R.S. 280 A.3d 5, at *5-6 (Pa. Super. 2022) (unpublished table decision) (noting that "the L.A.K. Court made clear that, under the circumstances of that case, the mere filing of the custody complaint, without more, 'constituted the affirmative performance by father of a positive parental duty in the crucial six-month period before appellees filed the termination petitions' which prevented appellees from meeting their evidentiary burden under subsection 2511(a)(1)," and that the father in the case before the W.R.S. Court did not have any real opportunity to litigate the custody filing because of how quickly the petitioners filed the termination petition after the custody filing). Here, too, our ability to consider what Father did after he filed for the custody modification is stunted because of the snap-filing of the termination petition which limits our review to six months prior to its filing, and because the custody proceedings were stayed pending the outcome of this termination petition.

12

Child is aware that Father is her biological father, and that Mother would also continue to have as much access to the Child as she wishes (and because the Child alternates between identifying Mother by her first name as well as "Mom").[40] We also considered that the extended period Father went without seeing the Child between January and April of 2022 was a-typical of the prior history of visits Father had with the Child, evidenced in the calendar of visits in Petitioner's Exhibit 1. Father testified that his lapse in visits with the Child between January and April were due in part to transportation issues and in part to his "hanging around the wrong people and kind of being immature, not really having [his] priorities straight."[41]

We are cognizant that parents must exert reasonable firmness in overcoming obstacles and affirmatively act to parent their children. See In re Adoption of S.P., 47 A.3d 817, 822 (Pa. 2012). We are also cognizant that transportation issues and the self-imposed issue of "hanging around the wrong people" are not the type of obstacles that tend to garner great sympathy in terms of evaluating a parent's efforts, nor can they be given the same weight as obstacles imposed by others. We are also aware that Father's young age is not a "pass" for his lack of consistency in the six months preceding the filing of the petition. However, this is a totality-of-the-evidence analysis and our careful view of the evidence showed a very young parent who is paying child support to care for the Child and provides gifts to the Child on holidays, who visited with the Child five times in the six months preceding the filing of the termination petition, with a lapse during four of those months, and who also filed a petition to modify the custody order just prior to the termination petition's filing in order to adjust the schedule so that he could attempt to repair his inconsistency. On these facts, we were not convinced by clear and

---

[40] See, e.g., N.T. 10/3/22 at 22-23, 67-69.
[41] N.T. 11/7/22 at 38.

13

convincing evidence that Father had failed to perform parental duties or that he had evidenced a settled purpose in relinquishing his claim to the Child.

We also were not convinced that Maternal Grandparents proved Subsection (a)(2), which requires:

> the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2). This subsection does not require "affirmative misconduct," but instead may be proven by "acts of refusal as well as incapacity to perform parental duties." In re B.J.Z., 207 A.3d 914, 922 (Pa. Super. 2019). We did not find this statutory ground proven by clear and convincing evidence. We considered and were concerned with the fact that Father is currently living with his sister, and that he acknowledged that he does not currently have the means to have primary custody of the Child; he said he would need to establish his own home, steady employment, and "no more driving record" to be able to care for the Child full time.[42] We were not convinced, however, that the incapacity cannot or will not be remedied by Father. He is 20 years old, had recently obtained a new full-time job at the time of the hearing, and is paying support for the Child.[43] As we have discussed herein, Father had just filed a petition to modify the custody order to change his custodial times with the Child and to be able to take her from the Maternal Grandparents' home to exercise custody elsewhere, including with his family. We gave great weight to this fact, specifically that Father is clearly working towards parenting the Child in a more traditional and independent manner. We also credited Father's testimony that he believes he can be in the

---

[42] N.T. 11/7/22 at 33.
[43] N.T. 11/7/22 at 35.

14

position to have primary custody of the Child within the next year, which is supported by his taking legal action to better exercise his custody rights and expand them now, and by the 24 visits Father has had with the Child between May 2022 and the November 2022 termination hearing.[44] We simply do not find that Father is unable to remedy any incapacity he currently has to care for the Child. We also note that this is not a typical termination case where the Child has been waiting in a foster placement until such time that Father can get his life in order enough to demonstrate the stability required to reunify with the Child full time and cut the Child's ties from the foster family. Maternal Grandparents will continue exercising primary custody regardless of whether Father's parental rights are terminated. By virtue of the parents' young ages at the time of the Child's birth and the kindness and love of Maternal Grandparents, the situation has been set up by all parties at this point such that Maternal Grandparents care for the Child and Father has periods of visitation. We credit, deeply, Maternal Grandparents for their willingness to provide primary care for the Child, but we also sympathize with Father's perspective that he has not been permitted by Maternal Grandparents to involve his family in connecting with and caring for the Child.

Finally, we address a remaining claim that was not directly addressed herein: Maternal Grandparents' claim that we erred in denying the termination petition as to Subsections (a)(1) and (a)(2) "where the child's legal counsel and Guardian ad Litem both recommended the termination of Natural Father's parental rights."[45] We note first that the Child's legal counsel represented to the Court that given the Child's age, she was unable to speak to the Child about the ramifications of

---

[44] Id.

[45] Petitioner's/Appellants' Statement of Errors Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b), ¶¶ 1-2, filed February 17, 2023.

15

termination and therefore deferred to the GAL's recommendation.[46] The GAL recommended termination, but clarified that "the legal issues are separate from [her] recommendation as to what is in the best interest of the child," acknowledging that this is not "a clearcut situation," and, plainly, that "[t]here is a lot of hair on this case, absolutely."[47] We took that commentary to mean that the GAL's review of the case led to the equities weighing in favor of Maternal Grandparents because of their generosity, but that the legalities might not support same. We agree, but must follow our duty to apply the law and hold the petitioners to their clear-and-convincing burden of proof. We ultimately determined Maternal Grandparents failed to prove a statutory ground with evidence so clear and weighty that termination was clearly warranted.

### 2. Sufficiency of Evidence that Termination of Parental Rights is in the Child's Best Interests Pursuant to Section 2511(b)

Maternal Grandparents raise one claim with respect to Section 2511(b): whether we erred in failing to give primary consideration to the developmental, physical, and emotional needs and welfare of the Child.[48] As with all terminations, we gave primary consideration to the best interests of the Child. We were not convinced it was in the Child's best interests to terminate Father's parental rights. The Child knows Father is her father, and we are cognizant that Maternal Grandparents would continue to allow visitation from Father even if his rights would have been terminated.[49] The most recent evidence of Father's visits indicated Father had 24 visits between May and October 2022.[50] To terminate Father's rights at this point

---

[46] N.T. 11/7/22 at 44.

[47] Id.

[48] Petitioner's/Appellants' Statement of Errors Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b), ¶ 4, filed February 17, 2023.

[49] N.T. 10/3/22 at 22, 31, 68-70.

[50] Father's Exhibit No. 9, Visit Log. We note again that much was made of Father failing to visit the Child in between the two termination hearings. The GAL termed the missed visit a "no

16

would be to either remove a loving support in her life; if the parties cannot work together to make the visits happen in the event of termination, or to remove Father's title while he remains a support, neither of which would significantly contribute to the Child's stability at this time. We sympathize with Maternal Grandparents' desire to have certainty in their custody of the Child, but we feel that concern is more aptly directed to the custody court than to this Court in these termination proceedings. As we indicated in our order denying the termination petition, Father is not perfect, and we do hope he acts with greater urgency in parenting the Child and being a constant support for her. We finally note that this case was a difficult one for the Court to decide as Father has failed in certain regards discussed supra to parent the Child, and because we can see the Maternal Grandparents deserve the certainty of a decision in their favor. We nevertheless applied the burden of proof, weighed the evidence, considered the appropriate case law, and ultimately determined that the statutory grounds for termination were not proven, and that Father's actions moving toward greater consistency in parenting the Child make evident the Child's best interests at this time lie in allowing Father to be her parent in a more meaningful way. We again applaud Maternal Grandparents in their efforts to be primary caregivers for the Child presently, and we are confident that the custody court will also act in the Child's best interests in determining if and when expanded custody for Father is appropriate and fashioning the mechanics of same for the safety and welfare of the Child.

BY THE COURT,

_Christylee L. Peck_

Christylee L. Peck,       J.

---

show" but we credited Father's testimony that he discussed it with Maternal Grandparents and that Father did have RSV, fever, and diarrhea in that period. N.T. 11/7/22 at 13.

17

Distribution:

Allison G. Hastings, Esq.

Mark F. Bayley, Esq.

Corey M. Lamoureux, Esq.

Katie J. Maxwell, Esq.

Cindy Lee Martin, Esq.